JUSTICE NELSON
specially concurs.
¶67 I concur in our Opinion but write separately to express my concerns on two aspects of our decision-namely, the “affidavit” procedure and our focus on “trade secrets.”
¶68 Following the enactment of the federal Bill of Rights, James Madison wrote: “popular government without popular information or the means of acquiring it, is but a prologue to a farce or a tragedy or perhaps both.” James Madison, Writings of James Madison, 103 (Gaillard Hunt ed. 1910). In Montana, the public’s fundamental constitutional right to know, Article II, Section 9, was drafted and adopted to guarantee that the people would be able to realize what Madison observed was so important to an effective democracy-the ability of the people to acquire popular information about their government and institutions.
¶69 Before 1997, utilities were highly regulated. These utilities were kept on a short leash by the PSC, and the public justifiably could rest comfortable in the knowledge that its interests were being protected by an agency with the horsepower to make sure that Montana’s utility/monopolies were being managed and operated in a cost effective manner for the benefit of the public and with a fair return to shareholders.
¶70 For the most part, all that ended in 1997 with deregulation. See Title 69, Chapter 8, Montana Code Annotated. Since that debacle, the public has been treated to year after year of mismanagement, failures, *58 run away greed and bankruptcies in some of Montana’s premier utilities. Worse, because of deregulation, these failures along with the obscene salaries, bonuses and perks, the trophy homes and the platinum parachutes of senior management have been and are being effectively subsidized by workers who have lost their jobs, benefits and pensions; by shareholders who have lost their investments; and by rate payers whose enjoyment of cheap power has been replaced by some of the most expensive power in the northwest.
¶71 If the public is to have any ability to know and understand how its government is exercising its remaining control over the utilities, then individuals and organizations must have access to information that is filed by these utilities with government agencies, including the PSC. Our Opinion recognizes this reality.
¶72 However, I suggest that we must recognize another reality. Workers, shareholders, rate payers, and members of the public individually, are not likely to have the wherewithal to effectively exercise their constitutional right to know in connection with filings and proceedings before the PSC. Though they have the right to do so, few people struggling to make a living and support their families have the time and the resources to comb through volumes of data and documents filed with the PSC and to fight with the utilities over what is confidential and what is not. Much less do these Montanans have the expertise to understand how this information may affect their lives and finances.
¶73 For these reasons, I submit that the public’s right to know and another fundamental constitutional right-freedom of the press-are inextricably intertwined in cases such as this. Our Opinion discusses the right to know, Article II, Section 9, of the Montana Constitution. Freedom of the press is guaranteed under Article II, Section 7. This Section provides, in pertinent part:
Freedom of speech, expression, and press. No law shall be passed impairing the freedom of speech or expression. Every person shall be free to speak or publish whatever he will on any subject, being responsible for all abuse of that liberty.
¶74 I suggest that where, as a practical matter, members of the public may not have the capability to effectively exercise their right to know, the press and the media do have the time and resources to monitor proceedings before the PSC and to ferret out, analyze and publish information that will educate the public. Put another way, in exercising its own right to know, the media, can, via the right of freedom of the press, exercise the public’s right to know on its behalf *59 as well. See Associated Press, Inc. v. Department, 2000 MT160, ¶¶ 117-19, 300 Mont. 233, ¶¶ 117-19, 4 P.3d 5, ¶¶ 117-19 (Nelson, J. concurring).
¶75 To effectively exercise these rights, however, the press and media must have access to all of the documents and data filed by utilities with the PSC. And, this brings me to my concern with the “affidavit” procedure outlined at ¶ 56 of our Opinion.
¶76 Any competent lawyer is capable of crafting an affidavit that will render confidential or proprietary nearly any information that the utilities choose not to disclose. To be sure, our Opinion requires specificity in the showing to be made in the affidavit. The fact remains, however, that specificity is a relative term; and the PSC’s subjective judgment about the adequacy of the affidavit will ultimately be imposed on objectors-and the media-without any concomitant ability on the part of those persons and organizations to challenge the affidavit on the basis of having access to the original underlying data and documents themselves.
¶77 While we have clearly stated that the constitutional presumption is that information filed with the PSC is not confidential and that government operations and documents should be open, I fear that the prevalent culture of corporate and governmental secrecy will ultimately result in a balance where the utilities’ rights to due process and ownership of property carry far greater weight than the publics’ right to know and the media’s right to publish. In short, I suggest that our confidence in the “affidavit procedure” is likely the triumph of hope over experience. And, I will be surprised if this procedure provides any meaningful protection or remedy for those who would attack utilities’ claims of confidentiality. I believe that with some innovative and original thought, the PSC and counsel for the utilities, objectors and the media, could devise a procedure that would give the utilities temporary protection from disclosure and the objectors and media access to the original data, pending a final decision on judicial review as to what information must be kept from the public and that to which the public has the right to know.
¶78 My second concern is our focus on “trade secrets.” Throughout the Opinion, the Court refers to trade secrets and other “confidential proprietary information.” Yet, in addressing Issue 4, the possibility that the information at issue here is not a trade secret at all, but some other type of confidential proprietary information, is not explicitly acknowledged. While the Opinion acknowledges at ¶ 61 that the protection afforded a trade secret may vary depending on the *60 circumstances, e.g., public vs. private, the Opinion also implies at ¶ 62 that application of Montana’s Uniform Trade Secret Act is appropriate here. Given that the information at issue here is contract terms between two or more parties, rather than a trade secret held by one entity from its competitors, I would hesitate to direct the PSC or the District Court to look only to the Trade Secrets Act on remand.
¶79 A trade secret is defined under Montana law as follows:
“Trade secret” means information or computer software, including a formula, pattern, compilation, program, device, method, technique, or process, that;
(a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from it disclosure or use; and
(b) is the subject of efforts that are reasonable under the circumstances to maintain it secrecy.
Section 30-14-402(4), MCA. The whole purpose of the Trade Secrets Act is to prevent and to punish “misappropriation.” See generally Title 30, Chapter 14, Part 4, Montana Code Annotated.
¶80 It is not clear from our Opinion how contract information of the sort at issue here, qualifies as a trade secret under this definition nor is it apparent how the public can “misappropriate” information that must be filed with the government and that is constitutionally presumed not to be confidential. I am not aware of any claim in this litigation that the media is attempting to “misappropriate” the utility’s information. Indeed, the media is simply trying to gain access to information that is presumptively not confidential and that the public has a right to know.
¶81 That is not to say, however, that a utility may not have a protectable property right in its contracts. “Confidential business information has long been recognized as property.” Carpenter v. United States (1987), 484 U.S. 19, 26, 108 S.Ct. 316, 320, 98 L.Ed.2d 275. In addition, “confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy.” Carpenter, 484 U.S. at 26, 108 S.Ct. at 320 (citation omitted). Further, as the United States Supreme Court noted in Lynch v. United States (1934), 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434, valid contracts are “property,” which cannot be taken without just compensation, whether obligor be private individual, *61 municipality, state, or United States. Lynch, 292 U.S. at 579, 54 S.Ct. at 843.
¶82 But if disclosure of such information is required, the first question is to determine what type of information it is, in order to determine the type of protections to which it is entitled. Further, if the information is protected but nevertheless revealed by the government, the next question is not one of misappropriation, but rather, whether the utility has suffered some type of compensable damages or whether there has been a “taking” in the constitutional sense of the utility’s property for which the utility must be justly compensated under Article II, Section 29, of the Constitution. Moreover, and while an extensive discussion of takings jurisprudence is beyond the scope of this Opinion, it is important to acknowledge that not every taking is compensable. See for example and compare Penn Central Transp. Co. v. New York City (1978), 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631; Lucas v. South Carolina Coastal Council (1992), 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798; and Pruneyard Shopping Center et al. v. Robins (1980), 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741.
¶83 Tying the information at issue here to being a trade secret is a mistake in my view. This approach is, at one and the same time, over broad (in that the definition of trade secret is being expanded to include contract rights and information not encompassed within the statutory definition), and under inclusive (in that the utility may have a property right in information and contracts that are not trade secrets).
¶84 With the above caveats, I concur in our Opinion.